# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DANA STENHOLTZ,

       **Plaintiff,**

    **v.**           **Case No. 18-CV-1231**

ANDREW M. SAUL[1],
Commissioner of Social Security,

       **Defendant.**

# DECISION AND ORDER

## PROCEDURAL HISTORY

Plaintiff Dana Stenholtz alleges that she has been disabled since March 24, 2017, due to "bipolar disorder, anxiety, posttraumatic stress disorder, other mental illness, fibromyalgia, obesity, and diabetes[.]" (Tr. 13, 21.) In March 2017 she applied for supplemental security income benefits. (Tr. 255-63). After her application was denied initially (Tr. 128-43) and upon reconsideration (Tr. 144-59), a hearing was held before an administrative law judge (ALJ) on March 20, 2018 (Tr. 43-81). On May 15, 2018, the ALJ issued a written decision concluding Stenholtz was not disabled. (Tr. 13-34.) The Appeals

---

[1] As of June 4, 2019, Andrew M. Saul is the Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), he is substituted as the named defendant in this action.

Council denied Stenholtz's request for review on July 10, 2018. (Tr. 1-3.) This action followed. All parties have consented to the full jurisdiction of a magistrate judge (ECF Nos. 4, 7), and this matter is now ready for resolution.

## ALJ'S DECISION

In determining whether a person is disabled an ALJ applies a five-step sequential evaluation process. At step one, the ALJ determines whether the claimant has engaged in substantial gainful activity. The ALJ found that Stenholtz "has not engaged in substantial gainful activity since March 24, 2017, the application date[.]" (Tr. 15.)

The analysis then proceeds to the second step, which is a consideration of whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment is severe if it significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1522(a). The ALJ concluded that Stenholtz has the following severe impairments: "fibromyalgia, obesity, bipolar disorder/depression, and anxiety disorders (including generalized anxiety disorder and posttraumatic stress disorder)[.]" (Tr. 16.)

At step three the ALJ is to determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of the impairments listed in 20 C.F.R. Part 4, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 416.1526, 416.920(d), and 416.926) (called "The Listings"). If the impairment or impairments meets or medically equals the criteria of a listing and also meets the twelve-

month duration requirement, 20 C.F.R. § 416.909, the claimant is disabled. If the claimant's impairment or impairments is not of a severity to meet or medically equal the criteria set forth in a listing, the analysis proceeds to the next step. The ALJ found that Stenholtz "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[.]" (Tr. 18.)

In between steps three and four the ALJ must determine the claimant's residual functional capacity (RFC), "which is [the claimant's] 'ability to do physical and mental work activities on a regular basis despite limitations from her impairments.'" *Ghiselli v. Colvin*, 837 F.3d 771, 774 (7th Cir. 2016) (quoting *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014)). In making the RFC finding, the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. §§ 404.1529, 416.929; SSR 96-4p. In other words, the RFC determination is a "function by function" assessment of the claimant's maximum work capability. *Elder v. Astrue*, 529 F.3d 408, 412 (7th Cir. 2008). The ALJ concluded that Stenholtz has the RFC

> to perform sedentary work as defined in 20 CFR 416.967(a) except she could lift/carry 20 pounds occasionally and ten pounds frequently and she is limited to simple, routine and repetitive tasks, with no fast-paced work, only simple work-related decisions, occasional work place changes, and occasional interaction with the public.

(Tr. 20-21.)

After determining the claimant's RFC, the ALJ at step four must determine whether the claimant has the RFC to perform the requirements of her past relevant work.

20 C.F.R. §§ 404.1526, 416.965. Stenholtz's past relevant work was as an instructor and administrative assistant. (Tr. 33.) The ALJ concluded that Stenholtz "is unable to perform any past relevant work[.]" (*Id.*)

The last step of the sequential evaluation process requires the ALJ to determine whether the claimant is able to do any other work, considering her RFC, age, education, and work experience. At this step the ALJ concluded that, "considering [Stenholtz's] age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that [she] can perform." (Tr. 33.) In reaching that conclusion, the ALJ relied on testimony from a vocational expert, who testified that a hypothetical individual of Stenholtz's age, education, work experience, and RFC could perform the requirements of occupations such as a document preparer and sorter. (Tr. 34.) After finding that Stenholtz could perform work in the national economy, the ALJ concluded that she was not disabled. (*Id.*)

## STANDARD OF REVIEW

The court's role in reviewing an ALJ's decision is limited. It must "uphold an ALJ's final decision if the correct legal standards were applied and supported with substantial evidence." *LD.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1152 (7th Cir. 2019) (citing 42 U.S.C. § 405(g)); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017) (quoting *Castile v.*

*Astrue*, 617 F.3d 923, 926 (7th Cir. 2010)). "The court is not to 'reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner.'" *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). "Where substantial evidence supports the ALJ's disability determination, [the court] must affirm the [ALJ's] decision even if 'reasonable minds could differ concerning whether [the claimant] is disabled.'" *L.D.R. by Wagner*, 920 F.3d at 1152 (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)).

## ANALYSIS

Stenholtz argues that the ALJ erred (1) in evaluating her statements concerning the intensity, persistence, and limiting effects of her symptoms; and (2) in evaluating and giving little weight to the opinions of Lauren Bremberger, M.D., Carmen Kosicek, NP, and Arriann Tauer, MS, LPC. (ECF No. 12.)

## I.    Symptom Evaluation

In making his RFC determination, the ALJ must engage in a two-step process to evaluate a claimant's symptoms. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, 2017 WL 5180304 at *3; *see also* 20 C.F.R. § 416.929. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's

symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities…." SSR 16-3p, 2017 WL 5180304 at *3. The ALJ's evaluation of a claimant's symptoms is entitled to "special deference" and will not be overturned unless it is "patently wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (citing *Eichstadt v. Astrue*, 534 F.3d 663, 667-68 (7th Cir. 2008)).

After considering the evidence in the record, the ALJ found that "the medical evidence documented [Stenholtz's] fibromyalgia, obesity, bipolar disorder/depression, generalized anxiety disorder, and posttraumatic stress disorder." (Tr. 25.) However, "[a]s for [Stenholtz's] statements about the intensity, persistence, and limiting effects of her symptoms, [the ALJ found that] they are inconsistent with the evidence as a whole." (*Id.*) The ALJ explained:

> Although she was obese with fibromyalgia, the medical evidence showed that she still exhibited reasonably good physical function during a number of examinations throughout the period at issue. She has exhibited abnormalities such as tender points but also full muscle strength, intact sensation, and a gait within normal limits. While participating in physical therapy, she was able to increase her physical abilities and tolerate the exercises reasonably well. Although she had mental impairments with various symptoms (such as depressed mood, feelings of anxiety, and irritability), the treatment records showed that she still exhibited reasonably good mental function during examinations. Among other things, the progress notes showed that she exhibited a cooperative and friendly attitude, appropriate affect, intact and adequate concentration, intact memory, average fund of knowledge, and no hallucinations or delusions. She indicated that psychiatric medication and therapy were helpful. She did not undergo any impatient mental health treatment during the period at issue.

(*Id.*) (Internal citations omitted.) As such, the ALJ did not accept Stenholtz's testimony that her impairments are work preclusive.

## A. Fibromyalgia

Stenholtz contends that the ALJ improperly evaluated her statements concerning the intensity, persistence, and limiting effects of her fibromyalgia. (ECF No. 13 at 12-13.)

Stenholtz reported significant physical problems due to fibromyalgia, including constant pain all over the body. (Tr. 21.) (Citing Tr. 978.) "She described the pain as 'burning, sharp, aching, throbbing, shooting and tingling." (*Id.*) (Citing Tr. 978.) "She asserted that prolonged activity such as sitting, standing, or walking made the pain worse." (Tr. 21-22.) (Citing Tr. 978.)

The ALJ found Stenholtz's statements concerning her fibromyalgia to be inconsistent with "the treatment records [that] showed that she exhibited reasonably good function during a number of examinations throughout the period at issue." (Tr. 22.)

> In May 2017, [Stenholtz] attended an appointment with Dr. David Tylicki, a pain and rehabilitation specialist, due to complaints of fibromyalgia. Dr. Tylicki stated that [Stenholtz] had several abnormalities upon examination including more than 13 tender points above and below the waist, a positive seated slump test on the right side, a positive straight leg raise on the right side, and pain and tenderness in the right foot. However, Dr. Tylicki further observed that [Stenholtz] exhibited five out of five muscle strength in the lower extremities, intact sensation to light touch in the lower extremities, symmetrical reflexes, and no dynamic weakness with ambulation. Dr. Tylicki advised that [Stenholtz] should take medication for fibromyalgia and attend physical therapy for spine problems and tendinitis. [Stenholtz] did not feel that Dr. Tylicki was helpful.

In July 2017, [Stenholtz] presented before a rheumatologist, Dr. Carly Skamra, with complaints of pain. Dr. Skamra observed that [Stenholtz] had 18 out of 18 tender points but an otherwise unremarkable examination during which she appeared well with no edema of the extremities, symmetrical reflexes, normal muscle strength, and no synovitis of the joints. Dr. Skamra concluded that [Stenholtz] would be better served by a comprehensive pain management program.

In August 2017, [Stenholtz] attended an evaluation with Dr. Yechiel Kleen, a pain and rehabilitation specialist, due to her complaints of chronic pain. At the time of evaluation, [Stenholtz] primarily took the medication Tylenol for pain. Upon examination, Dr. Kleen observed that [Stenholtz] was alert and oriented with no acute distress, full strength in all extremities, intact sensation in all extremities, positive straight leg raising that was due to body habitus rather than true deficit, the ability to stand on the heels and toes with some difficulty, morbid obesity, no muscle atrophy, and a gait within normal limits. Dr. Kleen believed that [Stenholtz] had chronic pain syndrome, fibromyalgia, physical deconditioning, sleep difficulties, and morbid obesity. Dr. Kleen suggested that [Stenholtz's] anti-depressant medications be increased to help control pain, she should attend physical therapy, and she should complete independent water therapy.

[Stenholtz] attended physical therapy with aquatic therapy during which she reported that she was surprised how well things were going. She tolerated the exercises reasonably well and was progressing toward her goals. As of October 2017, she met several goals including demonstrating independence with the home exercise program, ambulating up to 30 minutes on a level surface with a safe gait pattern, and a decreased score on the patient specific functional sale. She also confirmed that she had the abilities to walk in the grocery store and community for 30 minutes with increased ease and less fatigue as well as stand for 20 minutes or greater in church. She was advised to continue with independent strengthening in the pool for two to three days each week in order to increase strength and maintain functional activity tolerances. At the hearing, however, she testified that she stopped the water exercise because she no longer felt that she had the ability to drive due to anxiety.

(Tr. 22-23.) (Internal citations omitted.)

However, the Court of Appeals for the Seventh Circuit has recognized that "[t]he extent of fibromyalgia pain cannot be measured with objective tests aside from a trigger-point assessment." *Gerstner v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2018) (citing *Vanprooven v. Berryhill*, 864 F.3d 567 (7th Cir. 2017)); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("[I]t is difficult to determine the severity of [fibromyalgia] because of the unavailability of objective clinical tests."); (*see* Tr. 22 ("Dr. Tylici stated that [Stenholtz] had several abnormalities upon examination including more than 13 tender points above and below the waist…. Dr. Skamra observed that [Stenholtz] had 18 out of 18 tender points ….).)

As such, Stenholtz's "relatively good function" during examination (i.e., normal muscle strength, normal gait, symmetrical reflexes, intact sensation, and no edema) is not substantial evidence that her fibromyalgia is not disabling. *See Sarchet*, 78 F.3d at 307 ("Since swelling of the joints is not a symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of a headache is an indication that a patient's prostate cancer is not advance."); *Revels v. Berryhill*, 874 F.3d 648, 656 (9th Cir. 2017) ("What is unusual about [fibromyalgia] is that those suffering from it have muscle strength, sensory functions, and reflexes that are normal. Their joints appear normal, and further musculoskeletal examination indicates no objective joint swelling. …. There are no laboratory tests to confirm the diagnosis.") (internal quotations, citations, and alterations omitted).

Since the ALJ misstated the evidence about the manner in which Stenholtz's fibromyalgia affected her ability to perform full-time work, remand is necessary. On remand, the ALJ shall reevaluate Stenholtz's statements concerning the intensity, persistence, and limiting effects of her fibromyalgia in light of the relevant evidence in the record.

### B. Bipolar Disorder

Stenholtz also argues that the ALJ improperly evaluated her statements concerning the intensity, persistence, and limiting effects of her bipolar disorder. (ECF No. 12 at 6-12, 14-16.)

Stenholtz "reported various mental health symptoms including a depressed mood, feelings of helplessness or hopelessness, feelings of anxiety, anger outbursts, decreased energy, irritability, panic attacks, passive suicidal ideation, a history of manic episodes, 'trauma flashes,' and low self-esteem." (Tr. 23.) She testified at the March 2018 hearing before the ALJ:

> Q       The most common diagnosis I see is bipolar I disorder. For some people that implies you have periods of being sad and other periods being manic. Would that be a fair assessment of the cycles you go through or not?
> A       Yes. Mostly depressed but both.
> Q       Okay. And tell me about the depression. What symptoms do you have when you're feeling depressed?
> A       Everything from not being able to concentrate, to sleeping a lot, to crying, just an inability to do anything really.
> Q       And when you say crying how often would you say you have crying spells? And we're talking about the last year or so.
> A       Every day.

Q     And do you -- if you're feeling particularly depressed on a day where would I -- where would you normally be in your house or some other place?

A     I spend a lot of time in bed when I'm depressed.

Q     And in terms of your personal care do you keep up with that, showering, brushing your teeth, and fixing your hair and stuff or when you're depressed does that slide?

A     When I'm depressed there's -- I don't care about it at all.

Q     And then you said that's a more frequent problem than mania?

A     Correct.

Q     If you would look -- however you want to describe an average month how many days do you think you're feeling predominately depressed as opposed to manic?

A     You mean percent-wise how much am I depressed?

Q     Days, percentage, however you feel comfortable dividing that up.

A     I would say 25 out of 30 days I'm depressed.

Q     Okay. And the rest you're feeling okay or manic or what?

A     Flat-line to manic, depending on the day or the hour.

Q     And what do you mean flat-line to manic?

A     Flat-line would be -- that's what I call when I'm not feeling depressed and I'm not feeling manic either. I'm just kind of there. And manic is when I get angry and have a lot of outbursts.

Q     How do you sleep when you're manic?

A     When I'm manic I don't sleep.

Q     And there's a mention in the treatment notes about panic attacks.

A     Yes.

Q     Can you describe physically what happens to you during a panic attack?

A     I can't breathe, dry mouth, can't think, I feel like I'm going to die, just all around misery.

Q     And how often are you having those kind of episodes?

A     I would say I have at least one a week.

Q     And how long does that typically last?

A     Half an hour to an hour.

Q     And you're on the -- I had indicated that you're on the Effexor, and Clonazepam, and Ambien, and the ARISTADA injections --

A     Correct.

Q     -- is that correct?

A     Yes.

Q     And how often do you take the injection?

A       The injection is once every two months.

Q       Any side effects of those medications?

A       Not that I know of.

Q       And you -- do you ever have bad days with your depression that are so bad that you wouldn't leave the house because of the way you're feeling?

A       Oh, yes.

Q       What's a bad day like?

A       A bad day would be not even getting out of bed, or maybe I'd get out of bed to check my blood sugar and go to the bathroom and then I'd go back to bed.

Q       Do you do chores on a bad day or get dressed on a bad day?

A       No.

Q       How often in an average month do you have those kinds of days?

A       Four.

Q       And you've mentioned a couple times that when you're depressed you can't concentrate or you couldn't concentrate at the YMCA job.

A       Correct.

Q       Can you give me some other examples in your day-to-day life of problems concentration?

A       I can't read. I will read the same sentence over and over. I can't get past it. I can't remember things that people tell me. I freeze up when I'm asked to do stuff sometimes, like I just can't even do it, or like if I think I should do something I can't.

(Tr. 62-65.)

The ALJ found Stenholtz's statements concerning the intensity, persistence, and limiting effects of her bipolar disorder to be inconsistent with other evidence in the record, explaining:

> [Stenholtz] received mental health treatment before and after the alleged onset date, which included the use of psychiatric medications. Dr. Carlos Schenck started treating [Stenholtz] in the years before the alleged onset date. On September 1, 2016, Dr. Schenck stated that it was his last appointment with [Stenholtz] in Minnesota because she was moving to the Milwaukee area. Dr. Schenck stated that [Stenholtz] had bipolar disorder, posttraumatic stress disorder, generalized anxiety disorder, and insomnia. Dr. Schenck stated that [Stenholtz's] insomnia was controlled, her

posttraumatic stress disorder, depression and anxiety were stable, and she had mood stability with medications. Dr. Schenck documented that [Stenholtz] had a largely normal mental status examination. Likewise, Dr. Schenck observed that [Stenholtz] had fairly good function during previous examinations, as she had presented with a well groomed appearance, logical thought content, intact memory, and focused attention span/concentration.

More recently, [Stenholtz] saw Carmen Kosicek, NP, for psychotherapy and to obtain psychiatric medication. Ms. Kosicek assessed that [Stenholtz] had bipolar disorder, depression, schizoaffective bipolar type, posttraumatic stress disorder, and anxiety. Ms. Kosicek monitored [Stenholtz's] medication regimen that has included various prescriptions such as Aristada injections, Ambien, Klonopin, Baclofen, and Effexor. [Stenholtz] has reported to Ms. Kosicek that she had increased symptoms such as worsening anxiety. Although [Stenholtz] reported increased anxiety, she noted that it was not interfering with her home life in an unproductive way.

Ms. Kosicek's treatment notes indicated that [Stenholtz] exhibited reasonably good mental function during most appointments. Ms. Kosicek observed in December 2017 that [Stenholtz] was well groomed with a cooperative and friendly attitude, appropriate affect, normal motor activity, steady and even gait, intact and adequate concentration, intact judgment, good insight, good attention span, and no suicidal thoughts. Ms. Kosicek observed in February 2018 that [Stenholtz] presented with a friendly, cooperative and open attitude, good eye contact, an appropriate affect, a steady and even gait, the ability to follow commands, the ability to recall a timeline of events, normal thought content without suicidal intent, intact and adequate concentration, intact judgment, good insight, intact memory, no hallucinations, and a good attention span. Ms. Kosicek's treatment notes documented other examinations wherein [Stenholtz] exhibited reasonably good mental function.

Although [Stenholtz] reported ongoing mental health symptoms, she made a number of positive statements to Ms. Kosicek about her functioning and treatment. In April 2017, [Stenholtz] reported to Ms. Kosicek that she was cooking, doing other things again, and feeling good. In May 2017, [Stenholtz] reported to Ms. Kosicek that she felt good and treatment had been helpful. In August 2017, [Stenholtz] reported to Ms. Kosicek that she was doing really well, she worked part-time shifts, and she had been house

and dog sitting for her brother for two weeks. In December 2017, [Stenholtz] reported to Ms. Kosicek that she was loving the medication injections and things were going well. The treatment records did not document significant medication side effects.

[Stenholtz] has also attended sessions with counselors. At an initial consultation at a Christen [sic] Family Solutions facility in March 2017, [Stenholtz] appeared disheveled with an anxious mood, congruent affect and variable concentration. However, she further exhibited a cooperative attitude, normal speech, normal attention, intact memory, average fund of knowledge, intact judgment, fair insight, average intelligence, coherent thought processes, relevant thought content, and no hallucinations or delusions.

[Stenholtz] attended therapy with Arriann Tauer, MS, LPC, at Christen [sic] Family Counseling after the alleged onset date. At an appointment with Ms. Tauer in February 2018, [Stenholtz] reported a number of symptoms including out-of-control anxiety, catastrophic thinking, ruminating thoughts, fear, crying spells, hypercritical thoughts about herself, and feelings of dread. [Stenholtz] reported that she had been going out of the house two times per week to increase her mood and improve anxiety problems. She noted that she participated in a support group through her church for people with mental illness. Ms. Tauer used therapeutic techniques to treat [Stenholtz] at the session. Other progress notes from Ms. Tauer contained similar information, including [Stenholtz] reports of symptoms and life stressors along with summaries of their interactions at the sessions. [Stenholtz] did not receive any inpatient mental health treatment since the alleged onset date.

(Tr. 23-25.) (Internal citations omitted.)

Stenholtz contends that the ALJ failed to account for the variable functioning caused by her bipolar disorder by crediting her "subjective statements to her providers that she [was] doing well but [rejecting] her subjective reports to her providers that she [was] doing poorly." (ECF No. 12 at 10-11, 14-15.) However, contrary to Stenholtz's contention, the ALJ found that, despite her alleged good days and bad days, Stenholtz

consistently demonstrated normal functioning on mental status examinations. (Tr. 23-25; *see, e.g.,* Tr. 512-13, 522-23, 533-34, 544-45, 555-56, 566-67, 575-76, 581-82, 612-14, 624-25.) In addition, as the Commissioner points out, "[w]hile [Stenholtz] lists records that she argues show waxing symptoms [(ECF No. 12 at 8-9)], a number of those records indicated [Stenholtz] reporting symptoms, but then demonstrating normal functioning on mental status examinations." (ECF No. 17 at 9; *see, e.g.,* Tr. 505-13, 526-34, 537-45.) As such, the ALJ did not err in failing to account for Stenholtz's "variable functioning."

Stenholtz also contends that the ALJ's reliance on her mental status examinations is misplaced because "Stenholtz'[s] functioning when with a trained mental health professional with whom she has a long-term, therapeutic relationship is hardly evidence as to what her functioning would be like in a full time, competitive work environment[.]" (ECF No. 12 at 15-16.) However, the ALJ gave "great weight" to the opinions of state-agency psychological consultants Drs. Esther Leferve and Stephen Kleinman, both of whom are highly qualified experts in Social Security disability evaluation, 20 C.F.R. § 416.913a(b)(1), and who opined that, despite Stenholtz's impairments, she is capable of performing full-time, competitive employment. (Tr. 26-27, 138-41, 154-58.) As such, the ALJ's reliance on Stenholtz's mental status examinations was not misplaced.

Stenholtz further contends, and the court agrees, that the ALJ's reliance on her "lack of hospitalizations during the period at issue" is an error. (ECF No. 12 at 16.) "Courts have repeatedly stressed that an ALJ 'must not draw any inferences about a

claimant's condition from this failure [to pursue treatment] unless the ALJ has explored the claimant's explanations as to the lack of medical care.'" *Eula M. v. Berryhill*, No. 17 C 6669, 2019 WL 2173790, at *10 (N.D. Ill. May 20, 2019) (quoting *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008)); *see* SSR 16-3p, 2017 WL 5180304 at *9 ("We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. We may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints."). On remand, the ALJ shall consider *why* Stenholtz has not sought treatment in a manner consistent with her complaints.

## II.     Medical Opinion Evidence

### A.     Treating Physician–Dr. Bremberger

Stenholtz argues that the ALJ erred in giving "little weight" to her treating physician, Dr. Lauren Bremberger. (ECF No. 12 at 18-21.) In February 2018 Dr. Bremberger opined that Stenholtz would be off-task up to twenty-five percent of a typical workday; would be able to perform full time work on a sustained basis less than fifty percent of a typical workday; could continuously sit for thirty minutes and continuously stand for thirty minutes at one time; could sit and stand/walk for less than two hours in an eight-hour workday; could occasionally lift and carry ten pounds, rarely lift and carry

twenty pounds, and never lift and carry fifty pounds; would, on average, be absent from work (or miss at least a couple hours of work) more than four days per month; and would need to elevate her legs at or above heart level for at least two hours during a typical eight-hour period. (Tr. 597-600.)

"For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 745 F. App'x 247, 250 (7th Cir. 2018) (citing 20 C.F.R. § 404.1527(c)(2); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016)). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion" to determine how much weight to give the opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(c)(2)). While "[a]n ALJ must offer good reasons for discounting a treating physician's opinion" *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotations and citation omitted), courts will uphold "all but the most patently erroneous reasons for discounting a treating physician's assessment." *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (citing *Luster v. Astrue*, 358 F. App'x 738, 740 (7th Cir. 2010)).

The ALJ gave "little weight" to Dr. Bremberger's opinion, explaining in part:

Although Dr. Bremberger is a treating source who had the opportunity to observe [Stenholtz] on numerous occasions, the undersigned gives little weight to this opinion because it is inconsistent with the overall evidence. Dr. Bremberger offered a number of substantial/extreme assessments (including statements about sitting, standing, walking, laying down, elevating the lower extremities, off task behavior, absenteeism from work, etc.) that are inconsistent with her own treatment records. Dr. Bremberger's clinical findings frequently established that [Stenholtz] had reasonably good function. An examination performed a couple months before the alleged onset day by Dr. Bremberger (with the former last name of Lietzau) showed that [Stenholtz] only had trace to mild pitting edema to the mid shins but no other musculoskeletal abnormalities. Dr. Bremberger observed on April 25, 2017 that [Stenholtz] was morbidly obese but she had an otherwise unremarkable physical examination with no edema. In April 217, Dr. Bremberger documented that [Stenholtz's] edema improved with medication. Dr. Bremberger observed in July 2017 that [Stenholtz] had a largely normal examination with normal extremities, no edema, normal sensation, and a normal mood and affect. These clinical findings are inconsistent with Dr. Bremberger's opinion.

…

Moreover, Dr. Bremberger's opinion is inconsistent with other clinical findings in the record. Dr. Carly Skamra observed in July 2017 that [Stenholtz] had 18 out of 18 tender points but an otherwise unremarkable examination during which she appeared well with no edema of the extremities, symmetrical reflexes, normal muscle strength, and no synovitis of the joints. As of August 2017, Dr. Yechiel Kleen observed that [Stenholtz] was obese but she had full strength in all extremities, but intact sensation in all extremities, the ability to stand on the heels and toes with some difficulty, positive straight leg raising that was due to body habitus rather than true deficit, no muscle atrophy, and a gait within normal limits. These clinical findings are inconsistent with the extensive restrictions set forth by Dr. Bremberger.

(Tr. 28-29.) (Internal citations omitted.)

As discussed above, the ALJ misstated the evidence about the manner in which

Stenholtz's fibromyalgia affected her ability to perform full-time work by relying on her

"reasonably good function" on examination. On remand, the ALJ shall reevaluate Dr. Bremberger's opinions in light of the relevant evidence in the record. If the ALJ decides that Dr. Bremberger's opinions are not entitled to controlling weight, he shall give "good reasons" supported by the record for discounting them.

### B. Other Medical Sources–Ms. Carmen Kosicek and Ms. Arriann Tauer

Stenholtz also argues that the ALJ erred in giving "little weight" to the opinions of her nurse practitioner, Carmen Kosicek, and her licensed professional counselor, Arriann Tauer. (ECF No. 12 at 21-23.)

In February 2018 Kosicek opined that Stenholtz would need to lie down three or more hours during a typical eight-hour period due to fatigue or related symptoms; would have difficulties interacting with or working in proximity to others in a workplace setting; would be unable to consistently and independently leave her residence more than four days per month due to intrusive negative thoughts and self-doubt; would need unscheduled breaks two to three times a day due to crying, intrusive thoughts, panic/anxiety, paranoia, hallucinations/delusions, fatigue, and need to isolate; would be off-task more than thirty percent of a typical workday; would be able to perform work on a sustained basis less than fifty percent of a typical workday; would need extra supervision one to two times a day; and would, on average, be absent from work (or be tardy, need to leave work early, or need to leave the work station during the workday for two hours or more) more than four days per month. (Tr. 589-91.) Kosicek also opined that

Stenholtz would be markedly limited in her ability to understand, remember, and apply information; markedly limited in her ability to interact with others; markedly limited in her ability to concentrate, persist, or maintain pace; and markedly limited in her ability to adopt or manage herself. (Tr. 592-93.)

Also in February 2018 Tauer opined that Stenholtz would need to lie down three or more hours during a typical eight-hour period due to fatigue or related symptoms; would have difficulties interacting with or working in proximity to others in a workplace setting; would be unable to consistently and independently leave her residence more than four days per month due to panic/anxiety symptoms and depression; would need unscheduled breaks two to five times a day due to crying, intrusive thoughts, panic/anxiety, paranoia, hallucinations/delusions, fatigue, and need to isolate; would be off-task more than thirty percent of a typical workday; would be able to perform work on a sustained basis less than fifty percent of a typical workday; would need extra supervision several (3+) times a day; and would, on average, be absent from work (or be tardy, need to leave work early, or need to leave the work station during the workday for two hours or more) more than four days per month. (Tr. 714-16.) Like Kosicek, Trauer also opined that Stenholtz would be markedly limited in her ability to understand, remember, and apply information; markedly limited in her ability to interact with others; markedly limited in her ability to concentrate, persist, or maintain pace; and markedly limited in her ability to adopt or manage herself. (Tr. 717-18.)

Although Kosicek's and Tauer's opinions are not entitled to controlling weight, the ALJ is still required to consider the 20 C.F.R. § 404.1527(c) factors in determining how much weight to give their opinions. SSR 06-3p. The ALJ gave Kosicek's and Tauer's opinions "little weight," explaining:

Although Ms. Tauer was [Stenholtz's] counselor who had the opportunity to observe [Stenholtz] on numerous occasions, the undersigned gives little weight to this opinion because it is not supported by objective medical evidence. Ms. Tauer's treatment notes typically documented [Stenholtz's] subjective reports and summaries of their interactions during sessions. However, Ms. Tauer's treatment notes did not usually document any objective clinical findings about [Stenholtz's] mental status. These treatment records do not establish that Ms. Tauer was able to rely on any objective findings when offering her opinion. Rather, the treatment records suggest that Ms. Tauer primarily relied on [Stenholtz's] subjective reports. It is also notable that Ms. Tauer's opinion was based in part on [Stenholtz's] fibromyalgia symptoms, but any opinion about [Stenholtz's] physical limitations is outside Ms. Tauer's area of expertise. Moreover, the objective findings documented in other medical records are inconsistent with Ms. Tauer's opinion. At an initial consultation at a Christen [sic] Family Solutions facility in March 2017, another medical provider observed that [Stenholtz] exhibited reasonably good mental function. During the consultation, [Stenholtz] appeared disheveled with an anxious mood, congruent affect and variable concentration. However, she further exhibited a cooperative attitude, normal speech, normal attention, intact memory, average fund of knowledge, intact judgment, fair insight, average intelligence, coherent thought processes, relevant thought content, and no hallucinations or delusions. Likewise, the treatment records from [Stenholtz's] medical provider Carmen Kosicek, NP, revealed that [Stenholtz] frequently exhibited good function upon examination, such as adequate concentration, a cooperative and friendly attitude, and good insight. Accordingly, Ms. Tauer's opinion is inconsistent with the evidence as a whole. Additionally, the undersigned notes that she is not a qualified physician, psychiatrist or psychologist, and is therefore not a medically-acceptable source.

…

While Ms. Kosicek is a treating source who had the opportunity to regularly observe [Stenholtz] during appointments, the undersigned gives little weight to this opinion because it is inconsistent with the medical evidence, including Ms. Kosicek's own clinical findings. Ms. Kosicek's treatment notes indicated that [Stenholtz] exhibited reasonably good mental function. As discussed above, Ms. Kosicek observed in December 2017 that [Stenholtz] was well groomed with a cooperative and friendly attitude, appropriate affect, normal motor activity, intact and adequate concentration, intact judgment, good insight, good attention span, and no suicidal thoughts. Similarly, Ms. Kosicek observed in February 2018 that [Stenholtz] presented as friendly, cooperative and open attitude with an appropriate affect, normal insight, and intact memory. Ms. Kosicek's treatment notes documented other examinations wherein [Stenholtz] exhibited reasonably good mental function. Additionally, Ms. Kosicek's progress notes documented a number of positive statements by [Stenholtz] including her reports that she felt good and treatment had been helpful. Accordingly, Ms. Kosicek's treatment records are inconsistent with the marked and extreme limitations set forth in the questionnaire, as she exhibited reasonably good clinical findings and was not referred to more intensive outpatient therapy, must less impatient treatment for her mental symptoms. Furthermore, Ms. Kosicek's opinion is not supported by the treatment records from other medical providers showing that [Stenholtz] exhibited reasonably good mental function. For instance, Dr. Bremberger documented good mental function during examinations, such as a normal mood and affect, normal behavior, and normal judgment and thought content. Additionally, the undersigned notes that Ms. Kosicek [is] not a qualified physician, psychiatrist or psychologist, and is therefore not a medically-acceptable source.

(Tr. 30-31.) (Internal citations omitted.)

Stenholtz faults the ALJ for noting that Kosicek and Tauer were not acceptable medical sources, arguing that the ALJ was not allowed to ignore those opinions simply because they were not acceptable medical sources. (ECF No. 12 at 22-23.) However, as the Commissioner points out, "the ALJ did not ignore the opinions of Ms. Kosicek and Ms. Tauer. Rather, the ALJ provided almost [a] full page of analysis on each opinion." (ECF

No. 17 at 20.) In noting that Kosicek and Tauer were not "medically-acceptable sources," the ALJ simply found that their opinions were not entitled to any deference. *See* 20 C.F.R. § 404.1527(a)(2) ("Treating source means your own *acceptable medical source* who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.") (emphasis added); 20 C.F.R. § 404.1527(c)(2) ("When we do not give the treating source's medical opinion *controlling weight*, we apply the factors ….") (emphasis added). Therefore, the ALJ did not err in noting that Kosicek and Tauer were not acceptable medical sources.

The court finds that the ALJ provided good reasons supported by the record for discounting Kosicek's and Tauer's opinions. As such, the ALJ did not err in giving them little weight.

**IT IS THEREFORE ORDERED** that the Commissioner's decision is **reversed**, and pursuant to 42 U.S.C. § 405(g), sentence four, this matter is **remanded** for further rulings consistent with this decision. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 30th day of July, 2019.

WILLIAM E. DUFFIN
U.S. Magistrate Judge